# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

## CASE NO. 22-13698

_____

### CHRISTOPHER CHANDLER,

*Plaintiff/Appellant*,

v.

### MICHAEL A. ADKINSON, JR., in his official
capacity as Sheriff, Walton County,

*Defendants/Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
HONORABLE M. CASEY RODGERS
(3:21-cv-00507-MCR-EMT)

_____

## APPELLANT'S INITIAL BRIEF
_____

Marie A. Mattox
Ashley N. Richardson
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
(850) 383-4800
(850) 383-4801 (facsimile)
marie@mattoxlaw.com
ashley@mattoxlaw.com

**C-1**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant/Plaintiff Christopher Chandler, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files his Certificate of Interested Persons and Corporate Disclosure Statement:

    1.     Allen, Norton & Blue, P.A. (Law Firm for Appellee)

    2.     Christopher Chandler (Appellant)

    3.     Marie A. Mattox (Counsel for Appellant)

    4.     Marie A. Mattox, P.A. (Law Firm for Appellant)

    5.     Avery Dean McKnight (Counsel for Appellee)

    6.     Sheriff, Walton County (Appellee)

    7.     M. Casey Rogers (District Court Judge)

    8.     Jason Eric Vail (Counsel for Appellee)

**C-2**

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that oral argument will assist the Court's disposition of this case.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT .......................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...........................................C-2

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF JURISDICTION....................................................................... vii

STATEMENT OF THE ISSUES...............................................................................1

STATEMENT OF THE CASE ...................................................................................2

STATEMENT OF THE FACTS .................................................................................2

STANDARD OF REVIEW ......................................................................................19

SUMMARY OF ARGUMENT ................................................................................20

ARGUMENT .............................................................................................................20

I.  THE DISTRICT COURT ERRED BY GRANTING
    SUMMARY JUDGMENT ON CHANDLER'S DISABILITY
    DISCRIMINATION CLAIM............................................................................22

    A.  The decision-makers were aware of Chandler's disability.......23

    B.  Chandler experienced materially adverse employment
        actions. ..........................................................................................25

    C.  Appellee failed to engage in the interactive
        accommodation process. ...........................................................28

    D.  The District Court erred by finding that there was
        insufficient circumstantial evidence to raise an inference
        of discrimination. ......................................................................30

II.    THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON CHANDLER'S CHAPTER 760 RETALIATION CLAIM. ...................................................................33

   A.    Chandler engaged in protected activity. ...................................33

   B.    There is a causal connection between Chandler's protected activity and the adverse employment actions he experienced. ..............................................................................37

III.   THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON CHANDLER'S CLAIMS BROUGHT PURSUANT TO THE FAMILY AND MEDICAL LEAVE ACT. ......................................................................39

   A.    Chandler established a claim for FMLA interference. .............40

   B.    Chandler establish a claim for FMLA retaliation. ...................43

IV.    THE DISTRICT COURT ERRED BY FINDING THAT CHANDLER DID NOT PROFFER EVIDENCE TO ESTABLISH THAT APPELLEE'S MOTIVES WERE PRETEXTUAL. ..................................................................45

CONCLUSION .........................................................................49

CERTIFICATE OF COMPLIANCE......................................................50

CERTIFICATE OF SERVICE .............................................................50

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986)...................................................21

<u>Berg v. Fla. Dep't of Labor and Employment Sec., Div. of Vocational Rehab.</u>,
    163 F. 3d 1251 (11th Cir. 1998) ....................................................47

<u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006) ...........................37

<u>Burrage v. United States</u>, 571 U.S. 204 (2014) .......................................................39

<u>Burton v. City of Belle Glade</u>, 178 F.3d 1175 (11th Cir. 1999)...............................21

<u>Cavin v. Honda of America Mfg., Inc.</u>, 346 F.3d 713 (6th Cir .2003)..............41, 42

<u>Chapter 7 Trustee v. Gate Gourmet, Inc.</u>, 683 F.3d 1249 (11th Cir. 2012) ...........31

<u>Clemons v. Dougherty County</u>, 684 F.2d 1365 (11th Cir. 1982) ............................21

<u>Combs v. Plantation Patterns</u>, 106 F.3d 1519 (11th Cir. 1997)..............................45

<u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135 (3d Cir. 2004) ..............41

<u>Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169 (11th Cir. 2005) ...................................23

<u>Cottrell v. Caldwell</u>, 85 F.3d 1480 (11th Cir. 1996)................................................21

<u>Cruz v. Publix Super Markets, Inc.</u>, 428 F.3d 1379 (11th Cir. 2005)....................41

<u>Cutrera v. Bd. of Supervisors of La. St. Univ.</u>, 429 F.3d 108 (5th Cir. 2005) ........29

<u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354 (11th Cir.
    1999) ..........................................................................................47

<u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232 (11th Cir. 2001).......................26

<u>Edgerton v. City of Plantation</u>, 682 F. App'x 748 (11th Cir. 2017).......................37

EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015) ........................39

EEOC v. Chevron Phillips Chemical Co., LP, 570 F.3d 606 (5th Cir. 2009)...29, 30

EEOC v. Reichold Chems., Inc., 988 F.2d 1564 (11th Cir. 1993) ........................38

Embry v. Callahan Eye Found. Hosp., 147 Fed.Appx. 819 (11th Cir. 2005) ........44

GarciaPaz v. Swift Textiles, Inc., 873 F.Supp. 547 (D. Kan. 1995) ......................36

Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361 (11th Cir. 1999) .....28

Gay v. Gilman Paper Co., 125 F.3d 1432 (11th Cir. 1997)....................................41

Gowski v. Peake, 682 F.3d 1299 (11th Cir. 2012) .................................................37

Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316 (11th Cir. 2012)........32

Holland v. Gee, 677 F.3d 1047 (11th Cir. 2012)...................................................32

Holly v. Clairson Indus., LLC, 492 F.3d 1247 (11th Cir. 2007) ...........................30

Howard v. BP Oil Co., 32 F.3d 520 (11th Cir. 1994).............................................45

Jefferson v. Sewon America, Inc., 891 F.3d 911 (11th Cir. 2018)........................31

Jones v. UPS Ground Freight, 683 F.3d 1283 (11th Cir. 2012) ......................19, 22

Kleiber v. Honda of Am. Mfg., 485 F.3d 862 (6th Cir. 2007) ...............................29

Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019) ................31

Little v. United Techs., Carrier Transicold Div., 103 F.3d 956 (11th Cir.
    1997) ............................................................................................... 34-36

Lowery v. Strength, 356 Fed. Appx. 332 (11th Cir. 2009).....................................41

Martin v. Brevard Cty. Public Schools, 543 F.3d 1261 (11th Cir. 2008)..........40, 43

McNely v. Ocala Star–Banner Corp., 99 F.3d 1068 (11th Cir. 1996)....................26

iv

Olmsted v. Taco Bell Corp., 141 F.3d 1457 (11th Cir. 1998)...........................38, 44

Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130 (5th Cir. Unit A Sept. 1981)..........................................................................................35

Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133 (2000)...........................47

Russell v. KSL Hotel Corp., 887 So. 2d 372 (Fla. 3d DCA 2004)........................33

Sias v. City Demonstration Agency, 588 F.2d 692 (9th Cir. 1978) .......................35

Silver v. KCA, Inc., 586 F.2d 138 (9th Cir. 1978) .............................................34, 35

Silverman v. Bd. Of Educ., 637 F.3d 729 (7th Cir. 2011)......................................32

Smith v. Constr. Datafax, Inc., 871 F. Supp. 2d 1226 (N.D. Ala. 2012)................42

Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011).............22, 31, 32

Splunge v. Shoney's, Inc., 97 F.3d 488 (11th Cir. 1996).........................................35

Strickland v. Water Works and Sewer Bd. of the City of Birmingham, 239 F.3d 1199 (11th Cir. 2001) .....................................................................40, 43

Talavera v. School Board of Palm Beach Co., 129 F. 3d 1214 (11th Cir. 1997)....22

Terrell v. USAir, 132 F. 3d 621 (11th Cir. 1998)....................................................22

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) .......................32, 45

Tidwell v. Carter Products, 135 F.3d 1422 (11th Cir. 1998)..................................48

Tippens v. Celotex, 805 F.2d 949 (11th Cir. 1986)................................................20

Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100 (1st Cir. 2005) ................................29

Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338 (2013) ..............38

Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir. 1998)................38, 44

Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir.  2004) ..........................45

Woods v. DaimlerChrysler Corp., 409 F.3d 984 (8th Cir. 2005)...........................41


**Statutes**

42 U.S.C. § 12112(b) ...............................................................................30

29 C.F.R. § 825.300(b)(1)........................................................................42

29 C.F.R. § 825.300(c)(1) ........................................................................42

29 C.F.R. § 1630.2(o)(3)..........................................................................29

29 C.F.R. § 1630.9 ..................................................................................29

Chapter 760, Fla. Stat...........................................................................1, 20


**Rules**

Fed. R. Civ. P. 56 ...................................................................................21

## STATEMENT OF JURISDICTION

This case is a plenary appeal of a final decision of a district court of the United States, specifically, the United States District Court for the Northern District of Florida, Tallahassee Division. Accordingly, jurisdiction lies under 28 U.S.C. § 1291. Appellant timely filed his Notice of Appeal on October 31, 2022 [Doc. 47], following entry of the District Court's Order Granting the Motions for Summary Judgment on September 30, 2022. [Doc. 43].

## <u>STATEMENT OF THE ISSUES</u>

I.   Whether the District Court erred by finding that Appellee's decision-makers were not aware of his disability.

II.  Whether the District Court erred by finding that Chandler did not experience materially adverse employment actions, other than his termination.

III. Whether the District Court erred by finding that Appellee was not required to or did not fail to engage in the interactive disability accommodation process.

IV.  Whether the District Court erred by finding that there was insufficient circumstantial evidence to raise an inference of disability discrimination.

V.   Whether the District Court erred by finding that Chandler did not engage in activity protected by Chapter 760, Fla. Stat.

VI.  Whether the District Court erred by finding that there was no causal connection between Chandler's reports of discriminatory conduct and the adverse employment actions he experienced.

VII. Whether the District Court erred by finding that Chandler was unable to establish a claim for FMLA interference.

VIII. Whether the District Court erred by finding that Chandler was unable to establish a claim for FMLA retaliation.

IX.  Whether the District Court erred by finding that Chandler did not present evidence to establish that Appellee's motives for the actions it took against him were pretextual.

X.   Whether the District Court improperly weighed the evidence or viewed the evidence in a light most favorable to Appellees.

XI.  Whether the District Court erred by finding that there were no material facts in dispute precluding the entry of summary judgment.

## STATEMENT OF THE CASE

Plaintiff/Appellant, Christopher Chandler, brought suit in the Circuit Court in the First Judicial Circuit in and for Walton County, Florida, against the Sheriff of Walton County in his official capacity ("Sheriff"), alleging disability discrimination and retaliation under Florida Statutes § 760 (Counts I and II), and claims of interference and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601, et. seq. ("FMLA") (Count III). The Sheriff removed the case to the District Court for the Northern District of Florida, Pensacola Division, on grounds of federal question and supplemental jurisdiction. [Doc. 1].

The Sheriff filed a Motion for Summary Judgment on January 13, 2022. [Docs. 13-15]. Chandler responded in opposition on February 14, 2022. [Doc. 20-21]. The parties prepared reply briefs and submitted additional evidence following the initial round of briefing. [Docs. 27, 28, 40, 41].

On September 30, 2022, the District Court entered an order granting Appellee's Motion for Summary Judgment. [Doc. 43]. That order is the subject of this appeal.

## STATEMENT OF THE FACTS

Chandler is a certified Firefighter II and Paramedic; he has worked as a firefighter since 2004. [Doc. 20-30, 10:13-22, 14:7-14, 16:16-17:11]. He is also

certified to teach basic and advanced life support, as well as paramedic life support. [Id.]. He began working for Appellee in 2007. [Id.].

Chandler suffers from depression, Post Traumatic Stress Disorder ("PTSD"), and attention deficit hyperactivity disorder ("ADHD"). [Doc. 20-30, 28:3-13]. He first sought treatment for depression and PTSD in 2008. [Doc. 20-30, 28:16-23]. Chandler's depression initially manifested as subtle signs and symptoms, including difficulty sleeping, struggling to maintain a routine, and nightmares. [Doc. 20-30, 7:6-15]. He currently takes Zoloft to treat his depression. [Doc. 20-30, 6:15-7:5]. Chandler also takes Adderall for ADHD. [Doc. 20-30, 8:8-22].

Chandler's supervisors were aware of his disabilities. Specifically, at some point in 2018, he informed Chief Tim Turner that he suffered from depression and PTSD. [Doc. 20-30, 29:4-30:7]. Prior to these revelations, Chandler had an excellent work history with Appellee and no workplace issues or discipline. [Doc. 20-46, ¶ 6]. He genuinely enjoyed his work with the Department and as a Firefighter. [Id.].

While employed by Appellee, Chandler observed the ongoing gender-based and sexual harassment directed towards Firefighter Abbie Cook. [Doc. 20-30, 61:3-62:17]. She was harassed, bullied, and often moved around from station to station at the last minute. [Doc. 20-10, pg. 12; Doc. 20-29; Doc. 20-46, ¶ 7]. Chandler filed a report about the harassment with Appellee – specifically with Chief Tim Turner – on January 31, 2018. [Id.].

Cook testified that she experienced bullying by male firefighters – specifically Mike Griggs and Austin Pugh – while employed by Appellee. [Doc. 20-31, 5:1-17]. She also reported that conduct to Chief Beaty. [Id.]. Instead of remedying the conduct, they forced Cook to work with Griggs. [Doc. 20-31, 6:1-3]. Griggs made hostile comments about jokes about Cook as she attempted to test for lieutenant, taking aim at her gender and weight. [Doc. 20-31, 6:4-16, 14:4-14:25]. She reported the hostile treatment in or around November 2017. [Doc. 20-31, 7:6-9]. Although she continued to hear hostile comments and experience poor treatment following her promotion, Cook did not bother to report the conduct since no action was taken based on her prior complaints. [Doc. 20-31, 10:2-18].

Cook ultimately resigned, as she was tired of the mandatory overtime interfering with her family schedule and plans and she was constantly moved to different stations and positions. [Doc. 20-31, 10:19-11:4]. Although the mandatory overtime was supposed to rotate, Cook was called almost weekly and on occasion worked five straight days. [Doc. 20-31, 10:25-11:24].

Soon after, or about March 21, 2018, Chandler injured his hip and back while off duty. [Doc. 20-3; Doc. 20-30, 75:13-77:12]. As a result of the injury and ongoing treatment, he required, requested, and received leave pursuant to the Family and Medical Leave Act, which commenced on or about May 15, 2018. [Doc. 20-3; Doc.

20-13; Doc. 20-16]. However, while on leave, he was harassed about his return to work, and upon his return, was placed into a much less desirable position.

While on leave, another firefighter, Bill Blevins, came to Chandler's home to ask when Chandler would return. [Doc. 20-30, 123:18-25]. Blevins also harassed Chandler via Facebook and with phone calls, and Chandler thereafter reported the harassment to Turner. [Doc. 20-30, 124:4-125:13, 126:6-16]. Chief Tracy Vause had instructed Blevins to contact Chandler about his return from leave. [Id.].

Also, while on leave, Chandler learned that he was promoted to lieutenant. This occurred during the second round of promotions in 2018, as he was not selected in the first round, which followed his report on Cook's behalf. [Doc. 20-30, 18:20-19:6, 20:1-16]. Chandler did not know why he was not selected in the first round, but that there was "some good competition and . . . there were some . . . better qualified lieutenant candidates." [Doc. 20-30, 20:11-16]. Some were not necessarily more qualified, but performed better on the written test. [Doc. 20-30, 21:7-13]. Several of those selected in the first round were not as experienced as Chandler, including Chad Hooper, Robin Grandstaff, Austin Pugh, Jeremy Radney, Eric Gill, and Abbie Cook. [Doc. 20-30, 40:3-41:11].

Chandler was released to work without restrictions on June 30, 2018. [Doc. 20-4; Doc. 20-17; Doc. 20-18]. He spoke with Chief Beaty on June 25, 2018, to relay that return to work date. [Id.]. He also emailed Newsome that same day. [Doc. 20-

19]. The effective date of Chandler's promotion was July 1, 2018. [Doc. 20-5]. However, when Chandler returned from leave, he worked several shifts at his former Station, number 8, as a firefighter/paramedic before he began in the lieutenant role. [Doc. 20-30, 172:6-21].

Immediately following his return from leave and promotion, Chandler was reassigned to Station 4. [Doc. 20-30, 120:11-22, 165:15-166:25]. This move was allegedly in the works prior to Chandler's protected FMLA leave, following his report on Cook's behalf and his disability disclosures. [Doc. 20-30, 33:16-23].

The station transfer carried with it a number of punitive actions. First, while at Station 8, Chandler was assigned to an engine. [Doc. 20-30, 27:6-16, 33:16-23, 34:4-24]. At Station 4, Chandler was assigned to an ambulance. [Id.]. Moreover, working at Station 4 greatly changed his job duties – he served as the single lieutenant over three shifts and a large station, without double or triple the call volume. [Doc. 20-30, 167:9-170:5]. Moreover, because he was on an ambulance at not an engine, his supervisory responsibilities changed. [Id.]. He primarily supervised or attended EMS calls, and did not supervise fire or hazardous scenes like he had his entire career. [Id.]. At Station 8, approximately sixty percent of calls were fire-related; at Station 4, the percentage dropped to ten. [Doc. 20-30, 170:17-171:4].

Station 4 is unquestionably the busiest station, and supervisors would assign people to Station 4 as punishment. [Doc. 20-30, 36:4-23]. It was a much less desirable work environment for a senior firefighter/paramedic or lieutenant. [Doc. 20-30, 99:4-100:21]. That station runs calls day and night, and it is generally where inexperienced medics are sent for training. [Id.].

Other firefighters agreed that reassignment to Station 4 was "absolutely" punitive, and it was obvious to coworkers that "something was going on." [Doc. 20-32, 6:13-7:2; Doc. 20-33, 10:14-11:3]. If one was a "veteran" employee with a lot of time in service, reassignment to Station 4 was "a passive-aggressive way for management to punish you." [Id.].

Although Chandler was out on FMLA leave for several weeks, he was a longtime firefighter/paramedic with substantially more patient contacts than other employees. [Doc. 20-30, 102:2-103:18; Doc. 20-46, ¶ 15]. He did not need to be retrained, nor did he need to increase his patient contacts. [Id.]. In fact, during the course of his employment, Chandler had completed well over 1300 reports documenting thousands of patient contacts. [Id.]. By comparison, one of the chiefs had written only eighty reports over the previous twelve years. [Id.]. This accusation that he was in any way lacking in patient contacts or experience is blatantly false. [Id.]. Others agreed, testifying that Chandler was a more than proficient paramedic,

who would not need remedial time following a brief workplace absence. [Doc. 20-32, 5:18-6:12].

Further, instead of putting Chandler, and experienced firefighter and now lieutenant, at a station where his expertise and leadership could be utilized, he was placed at Station 4 with a number of other supervisors present, riding an ambulance. [Doc. 20-30, 38:1-25]. In fact, the entire time Chandler was a Lieutenant, he was assigned to an ambulance and did not work on an engine. [Doc. 20-30, 52:23-25].

Chandler reported to his direct supervisor, Chief David Hatfield, that he felt targeted because he took FMLA leave when Hatfield reported to Chandler that he was, in fact, being reassigned to Station 4 because of that leave. [Doc. 20-30, 45:12-25, 136:9-137:2]. He also requested to be placed back on an engine, but Hatfield informed Chandler that Chiefs Tim Turner and Brad Newsome were responsible for his reassignment, and that he could do nothing to change the assignment. [Doc. 20-30, 53:1-25, 104:25-105:16, 108:2-13; Doc. 20-46, ¶ 16].

Hatfield then met with Turner and Newsome about Chandler's concerns, but the assignment stood. [Doc. 20-30, 53:1-25, 104:25-105:16, 108:2-13; Doc. 20-46, ¶ 16]. Newsome admitted that Hatfield did indeed meet with him and Turner and informed them that he told Chandler that he was placed at Station 4 because of their instructions. [Doc. 20-34, 12:1-7]. Confusingly, Newsome testified that this was "not true." [Id.].

8

Chandler also spoke with Chief Beaty about the Station 4 assignment following Hatfield's revelation that the unfavorable assignment followed his FMLA leave. [Doc. 20-30, 54:16-55:2].

In addition to the permanent assignment at Station 4, following his return from FMLA leave, Chandler's overtime assignments were also changed at the last minute, immediately prior to his shift. [Doc. 20-30, 52:1-19]. He would be moved to Station 4 on an ambulance, and another firefighter/paramedic would replace him on the engine he was originally scheduled for. [Id.].

Despite the punitive, discriminatory, and retaliatory nature of his transfer, Chandler continued to perform his job duties to the best of his ability, and there were absolutely no concerns with his performance. [Doc. 20-46, ¶ 20]. He was, however, passed up for an interview during the promotional process for District Chief during this same time. [Doc. 20-30, 63:11-65:7]. Then, on August 27, 2018, Chandler was accused of failing to report for duty and that after multiple attempts to contact him, including another visit to his home by Blevins, Chandler finally contacted Chief Turner. [Doc. 20-30, 139:10-20]. In a later prepared Notice of Proposed Discipline, Chandler is accused of failing to offer any reason for his failure, which is untrue, Chandler informed Turner that he had gotten the dates mixed up. [Id.]. Critically, Chandler did report for duty that day, although he was late, having mixed up the dates on his calendar. [Doc. 20-30, 140:8-12, 141:4-16].

Chandler spoke with Turner in person at Station 4 on August 27, 2018, about the scheduling mix up. [Doc. 20-10, pg. 6]. He also communicated to Turner that he was under extreme stress because of the trauma he was exposed to at work and the constant overtime assignments. [Id.]. He further informed Turner that workplace stress was affecting his home life, and he asked Turner not to send a subordinate to his home again because he felt it was unprofessional. [Id.]. Turner then send Chandler information about the Employee Assistance Program, as he requested. [Doc. 20-10, pg. 6; Doc. 20-20].

On August 29, 2018, Chandler reported to Hatfield an incident with Sarah Early occurring on August 19, 2018, in which she attempted to dodge a call for a second time. [Doc. 20-21]. He also reported that she would go to her home to feed her animals while on duty, and that she had recently, while on shift and in an ambulance, followed her husband home after she learned that he was driving while intoxicated.

On or about September 21, 2018, Newsome informed Chandler that he would once again work mandatory overtime, and became frustrated because another employee did not want to work two days in a row. [Doc. 20-46, ¶ 23]. Chandler stated that the mandatory overtime was "bullshit" and was frustrated that Newsome only laughed in response. [Id.]. Chandler agreed to work the mandatory shift, and walked out of the office unhappy, but maintaining his composure. [Id.].

During this encounter, Chandler did not yell at Newsome, although he was upset and used the word "bullshit" during the conversation. [Doc. 20-30, 138:14-139:9, 142:20-143:14]. Chandler did, however, accuse Newsome of engaging in retaliation. [Doc. 20-30, 144:1-18]. He did not use any other profanity. [Id.].

Chandler's conduct was not a "blatant disregard for authority and organization process." [Doc. 20-30, 145:11-147:16]. Although he testified that his behavior was inappropriate, he did not agree that he blatantly disregarded authority or process. [Id.]. He was frustrated with the situation and used a single profane word, something that was very common amongst firefighters and their supervisors, particularly related to the ongoing mandatory overtime requirements. [Doc. 20-46, ¶ 25]. No one was ever disciplined for this kind of conduct. [Id.].

Critically, the bargaining agreement governs mandatory overtime – all employees, including part time employees, must be contacted first before assigning mandatory overtime. [Doc. 20-32, 11:4-16; Doc. 20-34, 23:15-25:6]. It was clear that mandatory overtime was selectively assigned in violation of the collective bargaining agreement. [Doc. 20-33, 9:5-10:5]. In fact, other employees have complained or called out their supervisors about mandatory overtime assignments, even calling those assignment "bullshit", and those employees were not disciplined. [Doc. 20-32, 12:4-17, 13:13-14:23; Doc. 20-33, 6:22-7:24]. Another lieutenant, Eric

Gill, told Hatfield, a battalion chief at the time, that mandatory overtime was "bullshit" and he was not disciplined. [Doc. 20-33, 7:24-9:1].

Moreover, expressing frustration and even using profanity were not uncommon between subordinate and supervisor. [Doc. 20-31, 8:8-22; Doc. 20-32, 12:13-21]. Vause testified that cussing may be inappropriate, but it happens all the time. [Doc. 20-44, 23:15-25]. Blevins said "fuck you" over the phone to Chandler, even though Chandler was a supervisor. [Doc. 20-45, 10:23-11:20]. He claimed it did not matter because "everybody" knew he was going to be terminated. [Id.].

Another firefighter, Jonathan Thomas, testified that firefighting is an "alpha-driven world" and it was not uncommon to have heated conversations, strong arguments, and disagreements. [Doc. 20-40, 12:6-23]. He continued that cursing between subordinates and superiors was common. [Doc. 20-40, 12:24-13:5]. "Bullshit" and "damn" are common words in the fire station, used on a regular basis by all levels of firefighters and command staff towards one another. [Doc. 20-40, 14:1-15]. Chandler was the first and only person to be demoted and terminated for saying "this is bullshit." [Doc. 20-40, 15:6-8, 23:21-24:14].

Newsome testified that he reported the incident to Chief Beaty "as instructed." [Doc. 20-34, 15:13-24]. He testified that he initially informed Chandler that he would not report it. [Doc. 20-34, 16:8-18]. It was not until approximately two weeks later that he was instructed by Beaty to prepare the report. [Doc. 20-34, 16:12-17:5].

Thus, on or about October 5, 2018, Chandler received a Notice of Proposed Discipline that recommended his termination. [Doc. 20-6]. He then requested a predetermination conference in response. [Doc. 20-7; Doc. 20-25; Doc. 20-30, 147:17-22].

He remained on administrative leave until his eventual termination. [Doc. 20-30, 148:3-9, 153:11-15]. While on leave, Vause contacted Chandler via phone, and Chandler expressed to Vause that he felt he was the victim of discrimination and retaliation. [Id.].

Major Clark conducted the conference, and during that meeting Chandler informed Clark that he felt singled out and discriminated against. [Doc. 20-30, 149:14-22]. He also reported to Major Clark that he experienced discrimination and retaliation because of his depression and his recent FMLA leave. [Doc. 20-30, 58:16-60:6].

He prepared a written response to Major Clark immediately following the predetermination conference. [Doc. 20-26]. In that letter, he further described the mental health struggles that had persisted in the workplace and his personal life for some time. [Id.].

Chandler further provided additional rebuttal to Chief Newsome's accusations, explaining as he had to Newsome that after declining an offer for voluntary overtime, Newsome spung the mandatory overtime on Chandler at the last

minute, causing him considerable personal hardship. [Doc. 20-23; Doc. 20-26, pgs. 1-2]. Newsome responded sarcastically, and although Chandler's tone was less than cordial, which he admitted, he was not insubordinate. [Id.].

He further informed Major Cook that he was the victim of workplace hostilities, including being singled out because of his FMLA leave. [Doc. 20-26, pg. 2]. He informed Major Cook that he was placed at Station 4 as a penalty, and that he is seeking mental health assistance through EAP. [Id.]. He begged for his career – asking to be neither terminated nor demoted so that he could continue to serve the citizens of Walton County as he had done for over a decade without incident. [Id.].

Chandler then received a letter dated October 24, 2018, informing him that his termination was to instead be a demotion. [Doc. 20-8]. Chandler recalled receiving the letter in the mail, and thus did not refuse to sign it. [Doc. 20-30, 150:15-19]. He was actually contacted by James McMillian prior to retrieving the letter from the post office, and McMillian informed him of the demotion decision. [Doc. 20-30, 152:7-23].

Chandler was devastated to learn of his demotion. [Doc. 20-46, ¶ 30]. Others had engaged in identical or far worse conduct without issue, and it was clear to Chandler that he was being targeted. [Id.]. He informed McMillian that he could not return to work in a demoted role, but and that he believed the demotion was wrong and retaliatory because he reported sexual harassment in January, took FMLA leave,

14

and suffered from disabilities. [Doc. 20-30, 153:16-154:12]. Critically, he did not refuse to return to work, but was medically unable to do so because of his mental health state. [Doc. 41-1, ¶¶ 7-14]. Chandler had lengthy conversations with Vause, Hatfield, and McMillian, during which time he again relayed that he suffered from PTSD and was struggling emotionally at that time. [Id.]. He was still attending EAP sessions at that time and told his chain of command that he needed additional time to recover. [Doc. 41-1, ¶¶ 9-14].

Chandler was visibly emotionally distraught by the demotion. [Doc. 20-32, 15:11-16:12]. It was also obvious that Chandler was struggling emotionally prior to the demotion. [Id.]. He was put "in the hot seat at Station 4" when he got back from leave, and Halderson "wonder[ed] who he pissed off." [Id.].

Following that conversation, McMillian contacted Chandler on or about November 3, 2018, to inform him that his employment was terminated. [Doc. 20-46, ¶ 31]. He received a letter around that same time, dated October 26, 2018, informing him of that same decision. [Id.]. That Letter of Dismissal states that although Chandler was to be demoted, he "refused to come in and meet with Chief Tracey Vause." [Doc. 20-28, pg. 2]. There is no evidence to support this accusation – Vause called Chandler to inform him of the results of the predetermination conference, and specifically that Chandler was to be demoted. [Doc. 20-44, 16:8-14]. As he noted to Major Clark, his fragile mental health at that time prevented him

15

from working in a demoted role without justification and solely because of discrimination and retaliation. [Doc. 20-26]. He did not refuse to report.

Jerry Bryan was the Chief Deputy of the Sheriff's Office at all times relevant to this action. [Doc. 20-38, 7:6-16]. He signed off on Chandler's termination based on a recommendation from Chandler's chain of command. [Doc. 20-38, 8:16-9:17]. He has no personal knowledge of or involvement in any of the matters related to Chandler's employment, discipline, and termination. [Id.]. He did not prepare the Notice of Proposed Discipline. [Doc. 20-14; Doc. 20-38, 10:11-21]. Any information contained in the Notice came directly from a member of Chandler's chain of command. [Doc. 20-38, 11:4-12, 13:21-14:3]. In fact, Bryan testified that he did not even know who was in Chandler's chain of command. [Doc. 20-38, 11:17-12:6].

Moreover, Bryan did not conduct any independent investigation. [Doc. 20-38, 13:1-6]. Bryan was not present during the predetermination conference. [Doc. 20-38, 14:15-18]. He testified that he actually does not know who Chandler is and has never met him. [Doc. 20-38, 16:6-13].

Critically, other lieutenants – who were not disabled, did not report discrimination, and did not utilize FMLA leave – were treated far more favorably for the same or more egregious conduct. Chad Hooper was also a lieutenant, but was not disciplined for hitting another employee. [Doc. 20-36, 7:3-8:20, 10:7-9]. Hooper

16

admitted that he slapped Jonathan Thomas on the buttocks in front of other employees. [Doc. 20-36, 9:5-10; Doc. 20-43, 10:19-11:12]. His supervisor, McElyea passed Thomas' complaint up through the chain of command, but Chief Beaty's only response was to transfer Hooper to a different station. [Doc. 20-43, 13:7-25; Doc. 41-2].

At least one employee quit working for Appellee because of Hooper. [Doc. 41-2]. Three others, Dawson, Marcus, and Lilly, made complaints against Hooper, but none of those complaints were investigated. [Doc. 41-3, pgs. 14-16]. Brandon Justice experienced months of harassment by Hooper, eventually forcing him to resign. [Doc. 41-2, pg. 6]. Although he reported the harassment to Chief Beaty, Justice was forced to continue working under Hooper's supervision even after he tendered his resignation. [Doc. 41-1, ¶ 5; Doc. 41-2, pgs. 7-17]. In fact, Beaty's only response after Justice reported the harassment was "please don't sue us." [Doc. 41-2, pg. 17]. Hooper was not disciplined. [Doc. 41-3, pg. 17].

Sarah Earley, also a lieutenant, had a well-documented history of using profanity. [Doc. 20-40, 9:24-10:16, 16:5-18:3]. Early was actually promoted to lieutenant with a writeup recently in her file, against policy. [Id.]. Importantly, although she was not a probationary lieutenant, the applicable workplace rules were no different for probationary employees than any other employee. [Doc. 41-1, ¶¶ 2-4].

Early's conduct is far more egregious, however. Braden Cooper, an EMT, testified that he worked on an ambulance with Early one evening when she followed her drunk husband home in Appellee's ambulance. [Doc. 20-35, 7:22-9:9]. Early informed Cooper that her husband had called her and she discovered he was intoxicated, so she wanted to catch up with him, follow him, and make sure he got home safe. [Id.]. Cooper mentioned the incident to Lt. Radney. [Doc. 20-35, 10:7-25]. Although her conduct endangered public safety, she was not disciplined. [Doc. 41-1, ¶¶ 2-4].

Early would also stop by her home on duty to feed her animals. [Doc. 20-35, 11:17-25]. This occurred on every shift Cooper had with Early, at approximately 5:00 each night. [Doc. 20-35, 12:6-18].

On yet another occasion, Early's supervisor, John Carter, gave her a written reprimand for dodging a call. [Doc. 20-39, 6:18-7:2]. He described dodging a call as "serious." [Id.]. She was the closest available unit, and Carter ended up running the call, and the patient suffered because it took longer for an ambulance to respond. [Doc. 20-39, 7:2-10]. It was the second time she had done so. [Doc. 20-39, 9:6-20]. However, the reprimand was overturned and downgraded to a verbal counseling by District Chief Chris Brown. [Doc. 20-39, 10:1-18].

Others who made complaints or those who were actually disabled or perceived as such, were also terminated. Corey Dickey filed a complaint against Vause, and

18

after he returned to work with Appellee, both Dickey and her husband, Blaine Halderson, were fired. [Doc. 20-32, 4:2-15; Doc. 20-33, 4:1-23]. To support their termination, Halderson and Dickey were mandatoried on the same shift, which meant their children would be left alone. [Doc. 20-35, 18:10-19:15]. They were terminated soon after. [Id.].

Jonathan Thomas was fired in February 2020 following a medical condition he brought forward in a grievance against Appellee. [Doc. 20-40, 5:18-8:7]. Thomas became very ill on shift, actually receiving medical treatment on scene at a structure fire, but was never given any relief so that he might leave for the day. [Id.]. He ended up in the ICU, and later filed a worker's compensation claim. [Id.]. Ultimately, he suffered a diabetic episode and required hospital treatment. [Doc. 20-41, 20:14-20].

He was then terminated for conduct unbecoming. [Doc. 20-40, 9:2-23]. He was, just like Chandler, accused of using a single cuss word during a meeting. [Doc. 20-40, 9:18-23]. Lt. Early was the one to write Thomas up for the profanity, when she herself had a documented history of using profanity. [Doc. 20-40, 9:24-10:16, 16:5-18:3].

## STANDARD OF REVIEW

The standard of review of an entry of summary judgment is de novo. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1291 (11th Cir. 2012).

## SUMMARY OF ARGUMENT

The District Court first erred by granting summary judgment on Chandler's disability discrimination claims, finding that the decision-makers had no knowledge of his disability, he did not experience materially adverse actions, and that Appellee did not fail to engage in the interactive accommodation process. The District Court then erred by granting summary judgment on Chandler's Chapter 760, Fla. Stat., retaliation claim, finding that he did not engage in protected activity and that even if he did, there was no connection between that activity and the adverse actions he experienced.  The District Court again erred by dismissing both of Chandler's FMLA claims, finding that he was not the victim of either interference or retaliation. Finally, the District Court erred by finding that Chandler did not proffer evidence to establish that Appellee's true motives for the adverse actions it took against him were pretextual. As shown herein, these findings were error, as was the District Court's order granting summary judgment. This Court should thus reverse the order and remand for further proceedings.

## ARGUMENT

"Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." Tippens v. Celotex, 805 F.2d 949, 952-53 (11th Cir. 1986). Summary judgment is proper only when "the

movant shows that there is no genuine dispute as to any material fact ***and*** the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

In deciding whether a genuine issue of material fact exists, courts must accept the truth of an appellant's allegations and evidence and "must draw all reasonable inferences in [an a]ppellant's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).

In order to withstand a summary judgment motion, the non-moving party must establish that based on the evidence in the record there can be more than one reasonable conclusion as to the proper verdict. Anderson, 477 U.S. at 250. This Court has further explained that in assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982) (citations omitted). In ruling on a motion for summary judgment, the court "may not weigh conflicting evidence or make credibility determinations of [its] own. If the record presents disputed issues of fact,

the court may not decide them; rather, [it] must deny the motion and proceed to trial." Jones, 683 F.3d at 1292 (citations omitted).

Critical to the matter here, a plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. Smith v. Lockheed-Martin Corporation, 644 F.3d 1321, 1328 (11th Cir. 2011). The District Court both viewed the disputed facts in a light most favorable to Appellee and made mistakes of law with regards to Chandler's claims against Appellee. Accordingly, as shown below, this Court should reverse the District Court's order granting summary judgment and remand the matter for resolution by the jury.

## I.    THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON CHANDLER'S DISABILITY DISCRIMINATION CLAIM.

To establish a *prima facie* case of disability discrimination, Chandler must show that (1) he has a disability; (2) he is a qualified individual with a disability; and (3) he was unlawfully subjected to discrimination based on her disability. See Terrell v. USAir, 132 F. 3d 621, 624 (11th Cir. 1998); see also Talavera v. School Board of Palm Beach Co., 129 F. 3d 1214, 1217 (11th Cir. 1997). Below, Appellee did not dispute that Chandler was actually disabled, instead arguing that Appellee had no knowledge of his disability. Appellee also argued that Chandler did not suffer any

22

adverse employment action beyond his termination. The District Court agreed with Appellee, which, as shown below, was error.

Moreover, the District Court found that even if Chandler established a *prima facie* case of disability discrimination, he was unable to establish that Appellee's motives were pretextual. As the pretext analysis applies to each of his claims, it is addressed separately below, Section IV.

### A.     The decision-makers were aware of Chandler's disability.

Below, the Sheriff argued that Chandler was unable to establish that the decision-maker was aware of his disabilities. [Doc. 15, pg. 14, citing <u>Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169 (11th Cir. 2005)]. Essentially, the Sheriff contended that it could not have discriminated against Chandler because of his disabilities, because the alleged decision-maker, Deputy Chief Jerry Bryan, had no knowledge of Chandler's disabilities. [<u>Id.</u>]. The Sheriff further argued that Chandler's conversations with Turner do not impute actual knowledge to Bryan. [<u>Id.</u>].

The District Court agreed with the Sheriff, finding that Chandler's comments to Turned in a "general conversation at work" that he suffered from depression and PTSD could not be considered sufficient notice that he suffered from a disability. [Doc. 43, pg. 23]. This holding, however, ignores considerable evidence in the record and views the remaining evidence in a light most favorable to Appellee.

Critically, Bryan testified that he was <u>not</u> the decision-maker. At best, he was the authorized signatory to the Notice of Proposed Discipline and Letter of Dismissal. Bryan testified that he relied upon the information provided to him by Chandler's chain of command – which without question included Turner – and that Human Resources drafted the various documents for his signature. He conducted no independent investigation, spoke to no witnesses, and had no idea who Chandler even was. Any argument that Bryan was the decision-maker is disingenuous at best.

What the evidence here shows is that, at a minimum, Turner, Vause, Hatfield, and Clark were aware that Chandler suffered from PTSD and depression, and that he felt singled out because of his disabilities. Each took part in the adverse employment decisions Chandler experienced – reassignment, discipline, demotion, and termination. On August 27, 2018, Chandler informed Turner that his mental health had become concerning enough to seek assistance, and Turner sent Chandler the information about the Employee Assistance Program. Just over one month later, Chandler was notified that he was facing termination for conduct non-disabled employees were not subjected to. During and immediately after his predetermination conference, Chandler notified Major Clark that he believed the actions taken against him were due in part to his disabilities, and that his mental health continued to suffer because of the actions taken against him, including his reassignment and now the threat of termination. He begged to retain not only his employment but his position,

noting that a demotion or termination would have disastrous consequences on his mental health.

Despite his pleas, Chandler was demoted. He then informed both Vause and McMillian that his demotion and the continued actions taken against him were discriminatory, and was immediately terminated. These members of his chain of command were responsible for the recommendation to Bryan that Chandler be terminated, and each was aware of Chandler's mental health disabilities. Bryan made no independent investigation, and relied entirely upon the word of Chandler's supervisors. Whether or not he knew of Chandler's disabilities is irrelevant, his own testimony is clear that he was not the decision-maker and was merely an authorized signature.

If this evidence was properly viewed in a light most favorable to Chandler, the District Court should have concluded that there was, at the very least, a significant dispute of material fact as to Appellee's knowledge of Chandler's disability. Summary judgment was thus granted in error, and the order is due to be reversed.

**B.    Chandler experienced materially adverse employment actions.**

Although there is no dispute that Chandler's demotion and subsequent termination were materially adverse, the District Court found that the transfer to

Station 4 was not materially adverse. [Doc. 43, pgs. 18-19, 22-23]. Both the District

Court and Appellee relied on Davis, which held that

> Title VII's anti-discrimination clause the employer's action
> must impact the "terms, conditions, or privileges" of the
> plaintiff's job in a real and demonstrable way. Although
> the statute does not require proof of direct economic
> consequences in all cases, the asserted impact cannot be
> speculative and must at least have a tangible adverse effect
> on the plaintiff's employment. We therefore hold that, to
> prove adverse employment action in a case under Title
> VII's anti-discrimination clause, an employee must show a
> serious and material change in the terms, conditions, or
> privileges of employment.

Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis

added). Because Chandler did not suffer a loss of wages or benefits when he was

reassigned to Station 4, the District Court concluded that his reassignment was not

materially adverse. Respectfully, the court erred.

The Davis court noted that a change in pay is not always dispositive. Although

the Davis court ultimately concluded that the temporary reassignment at issue was

not materially adverse, the court did note that "a change in work assignments can

never by itself give rise to a Title VII claim; in unusual instances the change may be

so substantial and material that it does indeed alter the 'terms, conditions, or

privileges' of employment." Davis, 245 F.3d at 1245. Where the conditions of

employment change dramatically, courts have held that a position change or

demotion is materially adverse. McNely v. Ocala Star–Banner Corp., 99 F.3d 1068,

1077–78 (11th Cir. 1996) (holding that district court erred by refusing to submit verdict form allowing ADA plaintiff to recover for conduct short of termination where plaintiff alleged that he had been relieved of his supervisory duties, assigned to clean toilets as a janitor, and later reassigned to shipping department where he was expected to perform physical tasks difficult or impossible for him to complete).

Here, the evidence before this Court establishes that reassignment to Station 4 was entirely punitive. Although the District Court focused on Chandler's pay, hours, and benefits [Doc. 43, pg. 18], Chandler's call volume tripled, and his actual firefighting duties were all but eliminated. He ran calls day and night, despite needing no additional training or skill "sharpening," at great cost to his mental health and wellbeing. An objectively reasonable person could conclude, based on these facts, that the change in working conditions materially altered the terms and conditions of Chandler's employment.

The Sheriff then contended - and the District Court agreed - that even if the transfer was materially adverse, it was undertaken for a legitimate reason, specifically to "sharpen employee skills." [Doc. 15, pg. 19; Doc. 43, pgs. 18-19]. This allegedly legitimate explanation remains undermined by the record before this Court, as numerous witnesses testified that reassignment to Station 4 was undoubtedly punitive, and usually occurred when an employee angered his chain of command. Moreover, with over 1300 reports detailing thousands of patient contacts,

there is no evidence in this record that Chandler's skills needed any "sharpening." At most, the alleged legitimacy of this explanation is in dispute, and must be resolved by the jury.

Summary judgment should have been denied, and this Court should thus reverse the order in question.

### C. Appellee failed to engage in the interactive accommodation process.

Here, the District Court erred by finding that "the argument that the Sheriff failed to engage in the interactive process misses the mark because Chandler did not request a specific accommodation." [Doc. 43, pg. 25, citing Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999)]. Importantly, the District Court's reliance on Gaston was misplaced. There, the plaintiff had a long-time lifting restriction, and when her position description changed to include heavier lifting, the new general manager said she would need to meet those requirements "or else" and then stated that she knew the plaintiff could not actually meet those requirements. Id. at 1362. However, the manager took no action against the plaintiff, the plaintiff did not request any accommodation, and the plaintiff later resigned. Id.

Here, however, Chandler requested both EAP assistance and that he be allowed to retain his lieutenant position, as he had engaged in no wrongdoing substantially worse than any other comparable employee. Appellee then failed to engage in the interactive process once Chandler conveyed that he had a disability –

28

PTSD and depression – and required assistance or accommodations, including but not limited to reassignment away from Station 4, EAP assistance, and retention of his position.

Critically, an essential duty of an employer to provide reasonable accommodations to employees under the ADA is the duty to engage in the interactive process. 29 C.F.R. § 1630.2(o)(3); 29 C.F.R. § 1630.9. To initiate this mandatory interactive process, an employee must make the employer generally aware that they are suffering from a disability and need accommodation. See EEOC v. Chevron Phillips Chem. Co., LP, 570 F.3d 606, 621 (5th Cir. 2009). Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": "a meaningful dialogue with the employee to find the best means of accommodating that disability." Id. (quoting Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005). The process thus requires "communication and good-faith exploration." Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871 (6th Cir. 2007). When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations. Cutrera v. Bd. of Supervisors of La. St. Univ., 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an

employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended.").

In the present action, no employee has, or can, testify that they engaged in a "meaningful dialogue with the [Plaintiff] to find the best means of accommodating his disability," let alone communicated with Plaintiff in "good faith exploration" of potential accommodations. Chevron Phillips, 570 F.3d at 621 (quotations omitted). Moreover, Chandler's repeated discussions about his mental health and the need for assistance were sufficient to trigger that process, and the District Court erred by finding otherwise. See id. at 621-22. The Sheriff quite simply failed to take any action whatsoever despite Chandler's repeated requests. See Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1249, 1262 (11th Cir. 2007); see also, 42 U.S.C. § 12112(b). Thus, the District Court erred by granting summary judgment on Chandler's disability discrimination claim, finding in error that he failed to request an accommodation.

### D. The District Court erred by finding that there was insufficient circumstantial evidence to raise an inference of discrimination.

The District Court rejected without discussion Chandler's arguments below that the evidence before the court presented a "convincing mosaic" of circumstantial evidence to raise an inference of disability discrimination. [Doc. 43, pgs. 26-27]. However, as argued below, even if this Court were to determine that Chandler could not establish a formal *prima facie* case of disability discrimination, he has instead

proffered evidence to establish a "convincing mosaic" of discrimination. In <u>Lewis</u>, this Court stated that a plaintiff alleging intentional discrimination "must present sufficient facts to permit a jury to rule in her favor." <u>Lewis v. City of Union City, Georgia</u>, 918 F.3d 1213, 1220 (11th Cir. 2019). The Court continued that "[o]ne way that she can do so is by satisfying the burden-shifting framework set out in <u>McDonnell Douglas</u>." <u>Id.</u> Importantly, the Court also stated that a

> plaintiff can also present direct evidence of discriminatory intent, <u>see</u>, <u>e.g.</u>, <u>Jefferson v. Sewon America, Inc.</u>, 891 F.3d 911, 921–22 (11th Cir. 2018), *or demonstrate a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination*, <u>see</u>, <u>e.g.</u>, <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011) (citation and quotation marks omitted).

<u>Lewis</u>, 918 F.3d at 1221, n. 6 (emphasis added). The "convincing mosaic" standard does not require the formal presentation of each factor of the *prima facie* case.

Thus, "establishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case…[and] the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." <u>Lockheed-Martin</u>, 644 F.3d at 1328; <u>see also Chapter 7 Trustee v. Gate Gourmet, Inc.</u>, 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting <u>Lockheed-Martin</u>). If the plaintiff cannot produce a comparator, she "will always survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the discriminatory

31

intent." Lockheed-Martin, 644 F.3d at 1328; see also Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012). The circumstantial evidence creates a triable issue if it, "viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Lockheed-Martin, 644 F.3d at 1328 (quoting Silverman v. Bd. Of Educ., 637 F.3d 729, 734 (7th Cir. 2011)); see also Holland v. Gee, 677 F.3d 1047, 1062 (11th Cir. 2012) (holding plaintiff submitted sufficient circumstantial evidence for jury to find termination motivated by discrimination).

Chandler's burden at this stage is not onerous. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). The record reflects that his chain of command was aware of his mental health disabilities, and that following his return from FMLA leave, he was punitively reassigned to Station 4. He continued to request a transfer and express his concerns that the transfer was discriminatory in the first place, but his concerns fell on deaf ears. Instead, he was disciplined, threatened, demoted, and terminated for conduct that non-disabled employees were not. This evidence raises a reasonable inference of discrimination, and a reasonable jury could find for Chandler. The District Court thus erred, and this Court should reverse the order granting summary judgment.

## II.  THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON CHANDLER'S CHAPTER 760 RETALIATION CLAIM

To establish a *prima facie* case of retaliation, Chandler must show that she engaged in a protected activity, suffered a negative or adverse employment action, and that there is a causal connection between the two. Russell v. KSL Hotel Corp., 887 So. 2d 372, 379-80 (Fla. 3d DCA 2004). Below, the District Court found that Chandler did not engage in protected activity and even if he did, there was no causal connection between that activity and the adverse employment actions he experienced. [Doc. 43, pgs. 28-29]. Respectfully, the court erred.

### A.  Chandler engaged in protected activity.

The District Court concluded that despite his many reports of bullying and discrimination, Chandler did not engage in statutorily protected activity under either the participation clause or the opposition clause. [Doc. 43, pg. 28]. The court further agreed with Appellee's position below, that Chandler's complaints were too vague and did not identify those engaging in discriminatory conduct. [Doc. 43, pg. 29]. The record before this Court, however, establishes that Chandler did far more than make vague complaints. He reported gender discrimination and sexual harassment on behalf of Cook on January 31, 2018. He then reported his own discriminatory treatment beginning in July 2018 following his reassignment to Station 4. He repeatedly requested a transfer, informing command staff that the reassignment was

33

discriminatory and targeted him because he took FMLA leave. He continued to make these reports until the Sheriff finally terminated his employment.

With respect to his reports about the harassment Cook experienced, the District Court held that his reports were not protected because to qualify as an activity under the opposition clause, the opposition must be directed at an unlawful employment practice of an employer, because "the opposition of an employee to a coworker's own individual act of discrimination does not fall within the protection of Title VII." [Doc. 43, pg. 29, citing Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997). Little is distinguishable from the present situation, and those distinctions are instructive to the present matter.

In Little, the plaintiff reported a racially derogatory comment made by a coworker to his chain of command approximately eight months after it was uttered. Little, 103 F.3d at 958. Relying on the Ninth Circuit's opinion in Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978), the court concluded that the plaintiff's expression was only protected if the racial remark uttered by the coworker could be attributed to the employer, and subsequently found that it was not. Id. at 959-960. Thus, the plaintiff's opposition to the comment did not constitute opposition to an unlawful employment practice. Id.

However, the Little court noted that to hold an employer responsible under Title VII for a hostile environment created by a supervisor or co-worker, a plaintiff

must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. Little, 103 F.3d at 959 (citing Splunge v. Shoney's, Inc., 97 F.3d 488, 490 (11th Cir. 1996)); see also Silver, 586 F.2d at 142 ("Even a continuing course of racial harassment by a co-employee cannot be imputed to the employer unless the latter both knows of it and fails to take remedial action."). Herein lies the critical distinction: instead of waiting eight months, Chandler reported the harassment Cook experienced, but the conduct persisted. She was actually forced to continue working with her harasser after her report Appellee, which predated Chandler's. Thus, any argument that the conduct was not attributable to Appellee must fail, because Appellee allowed the conduct to continue between the time of Cook's report in November 2017 and Chandler's in January 2018.

The District Court then added that Chandler's report of bullying did not identify any sex discrimination or the individuals who engaged in the harassment, and thus he did not have an objectively reasonable belief that he was opposing an unlawful employment practice. [Doc. 43, pg. 29]. To start, he need not prove the underlying discriminatory conduct to establish an objectively reasonable belief that what he opposed was unlawful. Little, 103 F.3d at 960 (citing Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978) and Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981)). In

<u>Little</u>, the court concluded that because the plaintiff waited eight months and voiced opposition to a single remark by a coworker, it was not objectively reasonable to believe he reported an unlawful employment practice. <u>Id</u>. at 960. Here, however, Chandler reported a much more widespread pattern of ongoing harassment directed at Cook, and immediately reported the matter to his chain of command. It is objectively reasonable to believe that the bullying and harassment levied at Cook was based on her gender and unlawful.

As to his own personal reports, Chandler reported ongoing discrimination based on his mental health disabilities taken by Appellee, not a coworker. While these communications put Appellee on notice that Chandler experienced illegal workplace discrimination, courts are well aware that such express statements are not required, as it is well known that employees do not often speak with the clarity or precision of lawyers. "The relevant question, then, is not whether a formal accusation of discrimination is made but *whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner*." <u>GarciaPaz v. Swift Textiles, Inc.</u>, 873 F.Supp. 547, 559-60 (D. Kan. 1995) (emphasis added). Thus, any dispute as to the sufficiency of Chandler's complaints should have been resolved in his favor: he made his chain of command aware that he was the victim of targeting because of his disability, leave, and for continuing to make complaints about that

treatment. It is objectively reasonable to believe that Chandler reported discriminatory practices based on his disability, and accordingly, the District Court erred by finding that Chandler did not engage in protected activity.

### B. There is a causal connection between Chandler's protected activity and the adverse employment actions he experienced.

The District Court further held that even if Chandler could show protected activity, Chandler did not establish causation and presented no evidence that he would not have been terminated in October 2018 but for his conduct of submitting a report about bullying in January 2018. [Doc. 43, pg. 29]. This holding ignores Chandler's ongoing reports about the discrimination he experienced because of his disabilities, as well as the other instances of retaliation beyond his termination.

Importantly, although his demotion and subsequent termination are materially adverse, qualifying acts are broader in the retaliation context. Appellee subjected Chandler to a retaliatory hostile work environment, and he need only show that retaliation produced an objective injury or harm, such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Edgerton v. City of Plantation, 682 F. App'x 748, 750 (11th Cir. 2017) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 77 (2006)); Gowski v. Peake, 682 F.3d 1299, 1312 (11th Cir. 2012) (recognizing a cause of action for a retaliatory hostile work environment). The record before this Court establishes that Chandler was reassigned, demoted, and terminated following his reports, which

began in January 2018, of ongoing workplace harassment. A reasonable employee would be dissuaded from reporting discrimination if an unfavorable reassignment, demotion, and termination were the likely outcomes.

As to causation itself, this Court must look at the totality of the collective and continuous adverse employment actions. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1455-56 (11th Cir. 1998). To that end, courts "construe the causal link element broadly so that a 'plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); see also Wideman, 141 F.3d at 1457; EEOC v. Reichold Chems., Inc., 988 F.2d 1564, 1571 (11th Cir. 1993). Here, the pattern is clear. The more Chandler reported targeting, discrimination, and retaliation, the worse his work environment became, necessitating EAP counseling and resulting in his termination.

Finally, Defendant argued, and the District Court agreed, that Chandler must show that retaliation was the "but for" cause of his termination. See Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 344-347 (2013). Importantly, Nassar concerned the appeal of a jury verdict and the inquiry focused on the level of proof required to "prove retaliation," or the "cause in fact" – not the burden of persuasion necessary to defeat summary judgment. Id. Nassar holds that "but-for causation…requires proof that the unlawful retaliation would not have occurred in

38

the absence of the alleged wrongful action or actions of the employer." Id. at 360. "The term 'because of' appears frequently in antidiscrimination laws [and it] typically imports, at a minimum, the traditional standard of but-for causation." EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 772-73 (2015). Simply put, "but for" means that the protected activity "was the factor that made a difference." Leal v. McHugh, 731 F.3d 405, 415 (5th Cir. 2013). Justice Scalia explained that a variety of factors may be at play in a given scenario, but if the other factors standing alone would not have produced the same outcome, then it was "but for" the final or determinative act – "the straw that broke the camel's back." Burrage v. United States, 571 U.S. 204, 211 (2014). Here, there is no dispute that there were no issues with Chandler's performance, and that he alone was singled out for termination where others were not even disciplined. Had he remained silent, Appellee would not have sought his removal.

## III. THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT ON CHANDLER'S CLAIMS BROUGHT PURSUANT TO THE FAMILY AND MEDICAL LEAVE ACT.

Finally, the District Court erred by granting summary judgment on Chandler's claims of interference and retaliation brought pursuant to the Family and Medical Leave Act. There is no dispute that Chandler sought and was granted intermittent FMLA leave. There is similarly no dispute that he was transferred to Station 4 immediately upon his return from leave. He was thereafter demoted and terminated

following his request for additional time to treat his mental health conditions. As shown below, the District Court erred.

**A.    Chandler established a claim for FMLA interference.**

An FMLA interference claim constitutes *any* interference with the employee's rights under the Act. See Strickland v. Water Works and Sewer Bd. of the City of Birmingham, 239 F. 3d 1199, 1206 (11th Cir. 2001). One of the rights afforded by the act is "to be restored by the employer to the position of employment held by the employee when the leave commenced." Id. (quoting 29 U.S.C. §2914(a) (1)); see also, Martin v. Brevard Cty. Public Schools, 543 F.3d 1261, 1267 (11th Cir. 2008). For interference claims, the employer's "motives are irrelevant." Id.

Here, quite simply, Plaintiff utilized leave and was thereafter reassigned to Station 4, and those facts support his *prima facie* case. The District Court further held that the reassignment to Station 4 was not punitive, although there is considerable testimony in this record to dispute that factual finding. There is additional testimony that Chandler did not need any "sharpening" of his skills warranting a transfer to Station 4, and those factual disputes should have been resolved in Chandler's favor. On those grounds alone, summary judgment should be reversed.

In addition, Chandler argued below that Appellee interfered with his FMLA rights by failing to advise him that he could utilize FMLA leave at or near the time

of his demotion and termination, in response to his reports to his chain of command that he needed additional time to treat his mental health conditions.

Generally, a failure to advise of FMLA rights could constitute an interference with an employee's exercise of basic FMLA rights in violation of the FMLA. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004). To state a claim for interference, the employee must first give the employer a reason to believe that he is entitled to leave. See Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1385 (11th Cir. 2005). When "an employee's need for FMLA leave is unforeseeable, as it was here, the employee need only provide his employer with notice sufficient to make the employer aware that his absence is due to a potentially FMLA-qualifying reason." Cruz, 428 F.3d at 1382 (quotation omitted); Lowery v. Strength, 356 Fed. Appx. 332, 333 (11th Cir. 2009); Gay v. Gilman Paper Co., 125 F.3d 1432, 1436 (11th Cir. 1997). Verbal notice can be sufficient, 29 C.F.R. §§ 825.302(c), 825.303(b), and no "magic words" are needed. 29 C.F.R. § 825.301(b); Cruz, 428 F.3d at 1383–84; Woods v. DaimlerChrysler Corp., 409 F.3d 984 (8th Cir. 2005); Cavin v. Honda of America Mfg., Inc., 346 F.3d 713 (6th Cir .2003). The employee does not need to expressly assert rights under the FMLA, or even mention the FMLA, so long as the employee conveys enough information to put the employer on notice that an event described in the FMLA may have occurred. See Cruz, 428 F.3d at 1383–84 (citations omitted). There are no categorical rules governing the content of

41

notices—i.e., what is sufficient to put an employer on notice and what is not—instead courts recognize that "[w]hat is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." Smith v. Constr. Datafax, Inc., 871 F. Supp. 2d 1226, 1236–37 (N.D. Ala. 2012) (quoting Cavin, 346 F.3d at 724.

"[W]hen the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). The FMLA requires an employer to give an employee whose leave may be covered by FMLA "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.300(c)(1). There is no dispute here that Appellee provided no such written notice, again supporting a claim for FMLA interference.

The District Court dismissed Chandler's argument and held that there was no such claim in the complaint. [Doc. 42, pg. 16 n.17]. However, the complaint contains basic factual allegations that Chandler reported to his chain of command his ongoing mental health issues and that he experienced discrimination and retaliation because of those issues, while in the process of appealing the disciplinary action wrongfully

brought against him. [Doc. 1, pgs. 10-11]. These allegations support his claim as argued below, and the District Court erred by granting summary judgment.

**B.    Chandler establish a claim for FMLA retaliation.**

Chandler's *prima facie* showing is identical to that of any other employment retaliation claim. Strickland, 239 F. 3d at 1207 (11th Cir. 2001); Martin, 543 F.3d at 1268. The District Court found that the transfer to Station 4 and promotion were not materially adverse or caused by retaliatory animus. [Doc. 43, pg. 18].

The District Court continued that no reasonable jury would find the transfer to Station 4 to be materially adverse, and that no "reasonable emergency medical fire worker would be dissuaded from using FMLA leave by a promotion and transfer, which involved some different duties at a busy fire station within the same county." [Doc. 43, pg. 19]. This view of the evidence, however, favors Appellee, as Chandler proffered testimony from other witnesses that transfers to Station 4 were generally punitive in nature and came with significant changes in job duties, including a loss of fire duties.

The District Court further held that even if the transfer was materially adverse, there is no causation, because the transfer decision was made prior to Chandler's leave. [Doc. 43, pg. 19]. Even assuming this version of the facts is true and undisputed, Chandler requested numerous times to be transferred out of Station 4 following his return from leave, and those requests were denied. Those facts

establish causation as to his transfer, and Hatfield's admission that Chandler was transferred because of his leave supports that finding.

The District Court finally found that as it relates to his termination, there is no causation because there is no temporal proximity between his return from leave and his termination. [Doc. 43, pg. 20]. The court continued that there is no other evidence of retaliatory intent to establish a causal connection to the demotion or termination. [Id.].

Chandler returned from leave on or about July 1, 2018. On October 5, 2018, he received the notice of proposed discipline, a time gap of three months. Moreover, in addition to temporal proximity, Chandler may establish a connection between his protected activity and adverse employment action that could "reasonably support [a] jury's determination." Olmsted, 141 F.3d at 1460. However, there is no bright line regarding timing and inference. See e.g., Wideman, 141 F. 3d at 1457 (11th Cir. 1998) (one month sufficient to establish nexus); Embry v. Callahan Eye Found. Hosp., 147 Fed.Appx. 819, 831 (11th Cir. 2005) (two months between filing charge of discrimination and suspension sufficient to satisfy nexus). In the intervening time between his return from leave and the notice, Chandler reported numerous times that he continued to experience mental health issues that might require leave. Hatfield outright admitted that he was transferred because of his FMLA leave, establishing retaliatory animus.

44

These additional facts, coupled with the three month gap, establish causation. The District Court erred, and this Court should reverse the order granting summary judgment.

## IV.    THE DISTRICT COURT ERRED BY FINDING THAT CHANDLER DID NOT PROFFER EVIDENCE TO ESTABLISH THAT APPELLEE'S MOTIVES WERE PRETEXTUAL

To show pretext, Chandler must "demonstrate that the proffered reason was not the true reason for the employment decision… [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256; Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994); see also, Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir.  2004).

As to each of Chandler's claims, the District Court found that the Sheriff proffered an allegedly legitimate reason for demoting then terminating Chandler. [Doc. 43, pgs. 20-21, 26]. First, the District Court found that Chandler "admitted" the reasons for his demotion and "took ownership" of them. While Chandler never denied using a single profane word, the District Court mischaracterizes the overall

nature of Chandler's testimony, discussed further below. The District Court further found that Chandler had not proffered a comparator who was retained despite engaging in similar alleged misconduct. [Doc. 43, pg. 26]. This too is undermined by the record.

Here, following his January 2018 report about the discrimination Cooke faced, Chandler was slated for punitive reassignment to Station 4. Before the reassignment took effect, Chandler had to utilize protected FMLA leave to care for an off-duty injury. The assignment took effect immediately after his return from leave, and exacerbated his mental health conditions. He no longer worked on an engine, and requested repeatedly to be reassigned. As part of those requests, he informed his supervisors that he felt that the reassignment was both discriminatory and retaliatory, but his concerns were ignored.

Instead, Chandler was targeted for disciplinary actions. He was threatened with termination following his accidental confusion about the date of an overtime shift and after saying "this is bullshit" in response to additional mandatory overtime, after he had already communicated to Newsome that he could not take voluntary overtime that same day without experiencing significant hardship. Where, as here, the employer cites violation of work rules or poor performance to justify termination, Chandler can establish that the defense is pretextual if he submits evidence that (1) he did not engage in the work rule or particular poor performance; or (2) if he did

46

violate the rule or engage in that poor performance, other employees outside his protected class engaged in similar acts but were treated differently. See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999). The record before the Court below shows just that.

Other lieutenants cursed and used profanity regularly in the workplace and were not disciplined, let alone demoted or terminated. See Berg v. Fla. Dep't of Labor and Employment Sec., Div. of Vocational Rehab., 163 F. 3d 1251, 1255 (11th Cir. 1998) (inconsistent application of policies may be evidence of discrimination); Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000). Blevins said "fuck you" to Chandler, a supervisory employee, and was not disciplined. Hooper slapped another employee, and was not disciplined. Earley – in her most minor infraction – used profanity as a lieutenant, and was not disciplined. She also dodged calls on at least two occasions and followed her intoxicated husband home while driving a County ambulance.

There is considerable evidence in this record that profanity and aggressive dialogues between supervisor and subordinate were regular, daily occurrences, and that only Chandler was singled out for termination. Following the successful removal of Chandler, Appellee then used that same accusation on Jonathan Thomas, who also suffered from a disability, later terminating his employment on the same grounds after he suffered a diabetic emergency on the job. Similar to Chandler's

"bullshit" statement, Dickey and Halderson were terminated following complaints about Vause, after they were both mandatoried at the same time and were unable to work those shifts.

The District Court engaged in extreme hair-splitting to conclude here that Chandler was involved in a "dispute" with Newsome, not just a general conversation, and thus the use of profanity as compared to the others was somehow different. [Doc. 43, pg. 26]. This makes little sense - particularly given that Blevins said "fuck you" to Chandler, a far more personal use of profanity than stating that a mandatory overtime assignment was "bullshit."

A reasonable jury could certainly find that these excuses were crafted as pretext for Appellee's discriminatory and retaliatory conduct. See Tidwell v. Carter Products, 135 F.3d 1422, 1428 (11th Cir. 1998) (observing that identification of inconsistencies can be evidence of pretext). The District Court thus erred by finding that Chandler did not proffer sufficient evidence to establish pretext, and the order granting summary judgment is due to be reversed.

## **<u>CONCLUSION</u>**

Here, the District Court viewed the evidence in a light most favorable to Appellee's, and resolved disputed issues of material fact that required resolution by the jury. The District Court first erred relative to Chandler's disability discrimination claims, finding that the decision-makers had no knowledge of his disability, he did not experience materially adverse actions, and that Appellee did not fail to engage in the interactive accommodation process. The District Court then erred by granting summary judgment on Chandler's retaliation claim, finding that he did not engage in protected activity and that there was no connection between that activity and any adverse actions. The District Court again erred by dismissing both of Chandler's FMLA claims, finding that he was not the victim of either interference or retaliation. Finally, the District Court erred by finding that Chandler did not proffer evidence to establish pretext. This Court should thus reverse the order and remand for further proceedings.

Respectfully submitted,

s/ Ashley N. Richardson
Marie A. Mattox [FBN 739685]
Ashley N. Richardson [FBN 42003]
Marie A. Mattox, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
(850) 383-4800 (telephone)
(850) 383-4801 (facsimile)
ATTORNEYS FOR APPELLANT

## **CERTIFICATE OF COMPLIANCE**

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, the portions of this brief that must be counted contain 12735 words.

s/ Ashley N. Richardson
Ashley N. Richardson

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via electronic filing to all attorneys of record, this 11th day of January 2023.

s/ Ashley N. Richardson
Ashley N. Richardson